T.C. Memo. 1999-133

UNITED STATES TAX COURT

ROBERT S. McDANIEL, JR. AND W. JANE McDANIEL, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1622-98.                    Filed April 21, 1999.

George Browning III, for petitioners.

William R. McCants, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge:  Respondent determined the following de-
ficiencies in, and accuracy-related penalties under section
6662(a)[1] on, petitioners' Federal income tax (tax):

---

[1]  Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years at issue.  All
Rule references are to the Tax Court Rules of Practice and
                                        (continued...)

| Year | Deficiency | Accuracy-Related Penalty |
|------|-----------|--------------------------|
| 1993 | $4,752 | $950 |
| 1994 | 17,907 | 3,581 |

The issues remaining for decision are:

(1) Must petitioners recognize long-term capital gain in the amount of $48,193 in 1993 or 1994? We hold that petitioners must recognize that gain in 1994.

(2) Are petitioners liable for 1994 for the accuracy-related penalty under section 6662(a) with respect to the two matters that they have not conceded? We hold that they are.

## FINDINGS OF FACT

Many of the facts have been stipulated and are so found.

At the time the petition was filed, Robert S. McDaniel, Jr. (Mr. McDaniel) and W. Jane McDaniel (Ms. McDaniel), lived in Sarasota, Florida.

Mr. McDaniel is a practicing attorney who has been specializing in real estate matters since 1969. In 1981, he and seven other individuals, including George Palermo (Mr. Palermo) and Brent Parker (Mr. Parker), formed the Second Street Partnership (Second Street or partnership) and became general partners thereof in order to, inter alia, purchase, develop, and hold for rental income a specified real property located in Sarasota,

---

[1] (...continued)
Procedure.

Florida (Second Street real property). The Second Street part-nership agreement provided that each of its eight partners was to contribute capital, own partnership assets, and share in part-nership profits and losses in equal proportions.

On April 12, 1985, Second Street borrowed $625,000 from the National Bank of Sarasota, which was evidenced by a note (1985 note). As security for that note, on the same date Second Street mortgaged the Second Street real property (Second Street mort-gage) to the National Bank of Sarasota. The Second Street mortgage, which Mr. McDaniel signed, provided in pertinent part:

> 9. That the said Lender may, from time to time, extend the time of payment of said Note to subsequent owners of said lands and Premises, without notice to or request from the makers of said Note, and any such extension of time of payment shall not release the makers from liability on said Note.

> \* \* \* \* \* \* \*

> 15. That any indulgence or departure at any time by the Borrower, its successors or assigns from any of the provisions hereof, or of any obligation hereby secured, shall not modify the same or relate to the future or waive future compliance therewith by the Borrower. No act of omission or commission of Lender, including, without limitation, any failure to exercise any right, remedy or recourse, shall be deemed to be a waiver, release or modification of the same, such waiver, release or modification to be effected only through a written document executed by Lender and then only to the extent specifically recited therein.

> \* \* \* \* \* \* \*

> Except for any notice required under applicable law to be given in another manner, any notice, report, demand or other instrument required or permitted to be given

by this Mortgage shall be given or made in writing
* * *

      *    *    *    *    *    *    *

In the case of the Borrower [Second Street], addressed
to:

      Second Street Partnership * * *

      with a copy to:

      Robert S. McDaniel, Jr. Esq. * * * .

On April 12, 1988, the 1985 note was refinanced in the principal amount of $577,500 (1988 note) with Citizens and Southern Bank of Florida (C&S Bank), the successor to National Bank of Sarasota. The 1988 note was secured by the Second Street mortgage, which was modified where necessary to reflect the terms of that note.

On July 28, 1989, the 1988 note in the original principal amount of $577,500 and a future advance note dated July 28, 1989, in the original principal amount of $63,500 were replaced, consolidated, and renewed in the principal amount of $628,250 (1989 note) with C&S Bank. The 1989 note was secured by the Second Street mortgage, which was modified where necessary to reflect the terms of the 1989 note. According to the 1989 note, which Mr. McDaniel, inter alia, signed as a general partner, "On April 12, 1993, the maturity date of this Note, the remaining unpaid principal balance and accrued interest shall be due and

payable in full" (balloon payment). The 1989 note further

provided in pertinent part:

> All persons or entities now or at any time liable,
> whether primarily or secondarily, for the payment of
> the indebtedness hereby evidenced, for themselves,
> their heirs, legal representatives, successors and
> assigns, respectively, hereby (1) expressly waive
> presentment, demand for payment, notice of dishonor,
> protest, notice of nonpayment or protest, and diligence
> in collection; (2) consent that the time of all pay-
> ments or any part thereof may be extended, rearranged,
> renewed or postponed by the holder hereof and further
> consent that any real or personal property securing
> this Note or any part of such security may be released,
> exchanged, added to or substituted by the holder of
> this Note, without in anywise modifying, altering,
> releasing, affecting or limiting their respective
> liability or the lien of any instrument securing this
> indebtedness; (3) agree that the holder of this Note
> shall not be required first to institute any suit, or
> to exhaust any of its remedies against the maker of
> this Note or any other person or party to become liable
> hereunder, in order to force payment of this Note;
> (4) agree that the maker of this Note may be released
> by the holder hereof from any or all liability under
> this instrument, and such release shall not in any way
> affect or modify the liabilities of the remaining
> parties hereto * * *

(We shall sometimes refer to the indebtedness of Second Street as

evidenced by the 1989 note as the Second Street loan or the

Second Street debt.)

As a condition to making the Second Street loan, C&S Bank,

the lender, required Mr. McDaniel and Ms. McDaniel to, and each

did, execute a guaranty agreement (guaranty) under which each of

them guaranteed C&S Bank, inter alia, to make prompt payment of

all sums payable under the 1989 note.  Each guaranty provided in pertinent part:

2.  Guarantor does hereby irrevocably and uncondi-
tionally guarantee to the Lender the prompt payment of
the principal, interest and other sums payable under
the Note (including any extensions, modifications or
renewals of the Note) * * *

*     *     *     *     *     *     *

5.  The Lender may enforce the provisions hereof
from time to time as often as occasion therefor may
arise, and the Lender shall not be required to first
exercise any rights against any other person or party
primarily or secondarily liable in respect to the loan
or the obligations of Guarantor hereunder and shall not
be required first to initiate, pursue or exhaust any
remedies available to it against any other person or
party or to resort to or enforce any security in its
possession or under its control.

6.  No course of dealing or delay or omission on
the part of the Lender in exercising or enforcing any
of its rights or remedies under the Note, Instruments
of Security, or hereunder shall impair or be prejudi-
cial to the rights and remedies of the Lender hereunder
and the enforcement hereof.  The Lender may extend,
modify or postpone the time and manner of payment and
performance of the Note, Instruments of Security and
this Agreement, make advances and disbursements under
the Note and Instruments of Security, all without
notice to or consent by the Guarantor and without
thereby releasing, discharging or diminishing its
rights and remedies against the Guarantor hereunder.
Guarantor waives notice of acceptance of this Agree-
ment, notice of the occurrence of any default under the
Note, Instruments of Security, or hereunder, and pre-
sentments, demands, protests and notices of any and all
action at any time taken or omitted by the Lender in
connection with the loan or this Agreement.

7.  Guarantor further consents to the Lender
exchanging, surrendering, repledging or otherwise
dealing with the aforesaid items without impairing this
Guarantee and hereby waive[s] notice thereof to or

> obtaining the consent therefor of the Guarantor. Guarantor hereby consents to the partial or total release of Borrower or other persons primarily or secondarily liable to Lender for Borrower's indebtedness.  No act of omission of any kind by the Lender shall affect or impair this Guarantee and the Lender shall have no duties to the Guarantor. * * *

During the mid-to-late 1980's, the partnership interest of each of five of the general partners of Second Street, excluding Mr. Palermo, Mr. McDaniel, and Mr. Parker, was purchased by the then remaining general partners, and either C&S Bank or its successor NationsBank of Florida, N.A. (NationsBank) expressly released each of those five partners from any liability with respect to the Second Street loan.  By the end of 1991, Mr. McDaniel, Mr. Parker, and Mr. Palermo were the only general partners of Second Street.

Since at least some time in 1991, Second Street was experiencing negative cash-flows, which required its three general partners to make monthly contributions to it.  In May 1992, Mr. McDaniel was unable to continue making his share of those contributions.  He approached Mr. Palermo, informed him that he was unable to continue making monthly contributions to Second Street, and offered to deed Mr. Palermo his partnership interest.  By quitclaim deed dated May 12, 1992, Mr. McDaniel transferred his interest in the Second Street real property to George Palermo Architect, Inc.  On May 14, 1992, Mr. McDaniel assigned his interest in Second Street to George Palermo Architect, Inc.  At

the time of that assignment, Mr. McDaniel's capital account balance in Second Street was a negative balance in the amount of $48,193 (negative capital account balance). By corrective quitclaim deed dated September 9, 1993, Mr. McDaniel transferred his interest in the Second Street real property to the partnership. Although Mr. McDaniel had transferred his interest in the Second Street real property and assigned his partnership interest, Mr. McDaniel continued to see Mr. Palermo on a daily basis throughout the years at issue.

Mr. McDaniel did not receive an oral release or a written release in May 1992 with respect to any of Second Street's obligations, including the Second Street loan, when he quitclaimed his interest in the Second Street real property, and assigned his partnership interest, to George Palermo Architect, Inc. Nor did he receive any such release at any other time.

During 1992, Mr. Parker, one of Second Street's general partners, commenced a bankruptcy proceeding under chapter 11 in the Bankruptcy Court for the Middle District of Florida, Tampa Division. On November 20, 1992, that Court granted Mr. Palermo relief "from the Automatic Stay provisions of 11 U.S.C. Section 362(a)". In 1993, Mr. Palermo brought an action against Mr. Parker to dissolve Second Street.

The balloon payment required by the terms of the 1989 note came due on April 12, 1993. That payment was not made, and Mr.

Palermo met during 1993 with personnel of NationsBank about possible refinancing of the Second Street debt.  He also met with Joseph M. Martens (Mr. Martens) who was employed by Amresco Institutional, Inc. (Amresco), NationsBank's agent, and who became responsible for the management of the Second Street loan sometime during the first six months of 1993.  (Hereinafter, we shall refer collectively to NationsBank and Amresco as Nations-Bank/Amresco or the Bank.)  The topic of Mr. McDaniel's liability with respect to the Second Street loan did not arise in Mr. Palermo's discussions during 1993 with personnel of Nations-Bank/Amresco.

Even though the 1989 note had matured on April 12, 1993, Mr. Martens recommended in July 1993 that the Bank not take any action with respect to it until completion of Mr. Parker's bankruptcy proceeding.  That was because, under the proposed bankruptcy plan relating to Mr. Parker, Mr. Parker's interest in the Second Street real property was to be transferred to Mr. Palermo, and the Bank considered Mr. Palermo to be a valued customer who had sufficient liquidity and personal income to support the debt service on the Second Street loan.

NationsBank/Amresco adopted Mr. Marten's recommendation and decided to bill Second Street for interest only.  Monthly payments of interest only continued to be made by Mr. Palermo.  The Bank did not notify Mr. McDaniel or Ms. McDaniel of the failure

by Second Street to make the balloon payment due on April 12, 1993, or the arrangement to make monthly payments of interest only.

Throughout, inter alia, the period 1992-1994, personnel of the Bank prepared various internal documents (written internal reports) which were to be used, inter alia, to keep senior management of the Bank informed and in which they described the status of any activity with respect to the 1989 note and, inter alia, the respective guaranties of that note by Mr. McDaniel and by Ms. McDaniel. Written internal reports dated June 1992 and December 1992 that were prepared by Bob Thomas of Nations-Bank/Amresco listed Mr. McDaniel and Ms. McDaniel as guarantors of the Second Street loan, indicated that Mr. McDaniel was no longer a partner in Second Street, contained financial analyses of Mr. McDaniel and Ms. McDaniel based on the most recent financial statements that they provided to the Bank, and stated that

> THE BANK WILL NOT RELEASE MCDANIEL'S AND PARKER'S
> GUARANTEES, EVEN THOUGH THEY PROVIDE NO FALLBACK.
> HOWEVER, PARKER COULD BE DISCHARGED IN BANKRUPTCY.
> * * * BASED ON PALERMO'S LIQUIDITY AND NET WORTH, HE
> IS CAPABLE OF SERVICING THE DEBT IRRESPECTIVE OF THE
> OCCUPANCY OF THE BUILDINGS. * * *

A written internal report dated June 1993 that was prepared by Mr. Martens listed Mr. McDaniel and Ms. McDaniel as guarantors of the Second Street loan, indicated that Mr. McDaniel was no

longer a partner in Second Street, contained financial analyses of Mr. McDaniel and Ms. McDaniel based on the most recent financial statements that they provided to the Bank, and stated that "The bank will not release McDaniel's and Parker's guarantees."

In a written internal report dated July 1993, Mr. Martens recommended that the Second Street loan remain in so-called accrual status pending completion of Mr. Parker's bankruptcy proceeding.  That report stated in pertinent part:

> The loan has matured.  Guarantor Parker has filed a personal Chapter 11 bankruptcy.  The Reorganization Plan has not yet been confirmed.  The Plan proposes to give Parker's interest in the subject property to the other remaining guarantor, Palermo.  Palermo intends to dissolve partnership and refinance loan upon final approval of the bankruptcy court.  The General Bank has indicated a desire to retain the loan and they consider Palermo to be a desirable banking customer.  However the General Bank will not take the loan until Parker's bankruptcy has been resolved and Parker removed from the debt.  The loan will remain past due pending completion of Parker's bankruptcy.

> \* \* \* \* \* \* \*

> The guarantor Palermo has significant liquidity and personal income to support any operating deficiency.  The other guarantor Parker provides no support to the loan because of his impending bankruptcy.

> \* \* \* \* \* \* \*

> Following the final resolution of Parker's bankruptcy, Palermo will receive sole ownership of the subject property.  This action is expected to be completed 9/93.  Palermo has strong financial capacity to personally support the loan.  The general bank has indicated a desire to retain Palermo individually and

will likely refinance the loan and take it back into their portfolio, once Parker has been removed from the relationship.

Written internal reports dated December 31, 1993, and June 30, 1994, that were prepared by Mr. Martens continued to list Mr. McDaniel and Ms. McDaniel as guarantors of the Second Street loan, indicated that Mr. McDaniel was no longer a partner in Second Street, and contained financial analyses of Mr. McDaniel and Ms. McDaniel based on the most recent statements that they provided to the Bank. In the written internal report dated December 31, 1993, Mr. Martens stated that Mr. Palermo "continues to pay interest on the matured note and has agreed to pay all delinquent real estate taxes upon renewal of the loan." As was true of the written internal reports dated June 1992, December 1992, June 1993, and December 31, 1993, the written internal report dated June 30, 1994, discloses that the Bank was evaluating petitioners' assets as a possible collection source. Throughout the duration of the Second Street loan, Nations-Bank/Amresco affirmatively decided not to, and did not, discharge Mr. McDaniel from his liability to the Bank as a guarantor of that loan.

After having waited for about a year in order to permit Mr. Parker's bankruptcy matter to be resolved, and it having been resolved in early 1994, the Bank finally lost patience with respect to the Second Street loan. On April 21, 1994, Mr.

Martens, on behalf of NationsBank/Amresco, sent a letter to Mr. Palermo (April 21, 1994 letter) demanding payment of the Second Street loan. The April 21, 1994 letter notified Mr. Palermo that the 1989 note was in immediate default, that the Bank was giving Second Street 14 days within which to cure the default, and that if the obligations under that note were not fully satisfied by May 5, 1994, the Bank intended to accelerate all sums due thereunder and to commence collection activity.

After having received the April 21, 1994 letter, Mr. Palermo gave it to Mr. McDaniel and asked him to respond to it. By letter dated April 26, 1994, Mr. McDaniel informed Mr. Martens that Mr. Palermo had arranged for alternative financing that was expected to close no later than June 15, 1994, and requested that no action be taken by NationsBank/Amresco until that date.

In order to refinance the Second Street debt to the Bank, around August 1994 Mr. Palermo asked Northern Trust Bank of Florida, N.A. (Northern Trust) to approve a $590,000 loan to Second Street, whose general partners since March 1, 1994, were Mr. Palermo and George Palermo Architect, Inc. During the negotiations in 1994 with Northern Trust, Northern Trust did not solicit any financial information or personal guaranties or other agreements from Mr. McDaniel or from Mr. Parker. The collateral for the loan by Northern Trust to the partnership was to be the Second Street real property, Mr. Palermo's unconditional guaranty

of that loan, and Mr. Palermo's pledge of certificates of deposit in the amount of $230,000. Northern Trust decided to structure the loan from it to Second Street as a purchase by it from NationsBank/Amresco of the 1989 note.

On October 18, 1994, Northern Trust acquired the 1989 note from NationsBank/Amresco for $595,252.65, which amount was the sum of (1) the outstanding principal balance of $590,850 and (2) the accrued, unpaid interest of $4,402.65, which were due under that note. On the same date, a replacement promissory note (replacement note) in the amount of $590,850 payable to Northern Trust was executed on behalf of Second Street by Mr. Palermo as a general partner and by Mr. Palermo as president of George Palermo Architects, Inc., the other general partner of Second Street. The replacement note replaced the 1989 note of Second Street to the Bank. The first page of the replacement note stated that it had an effective date of April 12, 1993, and an execution date of October 18, 1994. All of the other documents relating to the replacement note issued by Second Street to Northern Trust contained the date of October 18, 1994, or a later date, and none of them contained the date of April 12, 1993.

At a time not disclosed by the record, an account of a type not disclosed by the record (account) was established for petitioners' daughter Holly McDaniel to be used for her college education. The sources of the funds in that account were Mr.

McDaniel, Ms. McDaniel, and Mr. McDaniel's father.  Another source for the funds in that account was a mutual fund that Mr. McDaniel established for Holly McDaniel shortly after she was born.  Mr. McDaniel and Ms. McDaniel managed the account that was established for Holly McDaniel.  During 1994, whenever Holly McDaniel needed funds, an amount of money would be transferred from the account to her checking account.

Petitioners filed a joint tax return (return) for 1992 sometime after April 5, 1993.  Second Street filed and issued to Mr. McDaniel a Schedule K-1, Partner's Share of Income, Credits, Deductions, Etc., for 1992, which reported that Mr. McDaniel had a separately stated long-term capital gain of $48,193.  Petitioners did not report that gain in their 1992 return.  Instead, petitioners included Form 8082, Notice of Inconsistent Treatment or Amended Return (Form 8082), with their 1992 return.  In that form, petitioners reported that Second Street had incorrectly reported Mr. McDaniel's negative capital account balance as a long-term capital gain.  Petitioners attached the following explanation to the Form 8082 that they filed with their 1992 return:

> During 1992, Robert S. McDaniel, Jr. and Second Street Partnership agreed that Mr. McDaniel would no longer be required to make additional capital contributions to the partnership in exchange for Mr. McDaniel giving up his 25% interest in the partnership.  Mr. McDaniel remains contingently liable for partnership liabilities, his share of which is reported on the 1992

Schedule K-1 as $55,821.  Most of this liability balance is represented by a first mortgage loan held by a bank for which partnership real property is pledged. The partners, including Mr. McDaniel, personally signed the loan agreement for which they have joint and several liability.  The bank has not released Mr. McDaniel from his obligation under the loan agreement.

At the time of Mr. McDaniel's 1992 agreement with the partnership, as described above, he had a negative capital account balance of $48,193.  His negative capital account balance was incorrectly reported by the partnership on his Schedule K-1 as a long-term capital gain.  Mr. McDaniel believes that the correct treatment of his negative capital account balance on his Schedule K-1 is to report the $48,193 on line J, box (d), "Withdrawals and Distributions".

The partnership's incorrect assumption that his negative capital account balance results in long-term capital gain is inappropriate inasmuch as Mr. McDaniel continues to be contingently liable for $55,821 in partnership liabilities.  At such time that Mr. McDaniel's share of partnership liabilities are repaid by the partnership, or otherwise settled, the appropriate tax treatment of Mr. McDaniel's negative capital account balance on withdrawal from the partnership can be determined.

Petitioners filed their 1993 return sometime after October 10, 1994.  Petitioners filed their 1994 return sometime after April 15, 1995.  In their 1994 return, petitioners erroneously claimed a dependency exemption for their daughter Holly McDaniel.

Petitioners did not report any income attributable to Mr. McDaniel's negative capital account balance in their 1993 return, their 1994 return, or any other return that they filed.

Respondent issued a notice of deficiency (notice) to petitioners for their taxable years 1993 and 1994. In that notice, respondent determined, inter alia, that (1) petitioners realized long-term capital gain in the amount of $48,193 for 1994, which resulted from the reduction in petitioners' share of the Second Street loan and (2) that petitioners are liable for 1993 and 1994 for the accuracy-related penalty under section 6662(a).

OPINION

Petitioners bear the burden of proving that respondent's determinations in the notice are erroneous.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

The parties agree that petitioners must recognize $48,193 of long-term capital gain pursuant to sections 752(b), 731(a), and 741 for the year in which Mr. McDaniel was relieved of his liability as a guarantor of the Second Street loan.  The parties disagree as to the year in which Mr. McDaniel was relieved of that liability.  Petitioners contend that Mr. McDaniel was discharged in 1993 from his liability as a guarantor of the Second Street loan.  Respondent contends that he was discharged from that liability in 1994.

In support of their position, petitioners rely on Fla. Stat. Ann. sec. 620.735(2) and (3) (West 1992) (repealed effective Jan.

1, 1998).[2]  Section 620.735 of the Florida Statutes Annotated

(section 620.735) provides in pertinent part:

> 620.735.  Effect of dissolution on partner's existing
> liability.--
>
>      (1) The dissolution of the partnership of itself
> does not discharge the existing liability of any part-
> ner.
>
>      (2) A partner is discharged from any existing
> liability upon dissolution of the partnership by an
> agreement to that effect between himself, the part-
> nership creditor and the person or partnership con-
> tinuing the business.  The agreement may be inferred
> from the course of dealing between the creditor having
> knowledge of the dissolution and the person or part-
> nership continuing the business.
>
>      (3) When a person agrees to assume the existing
> obligations of a dissolved partnership, the partners
> whose obligations have been assumed shall be discharged
> from any liability to any creditor of the partnership
> who, knowing of the agreement, consents to a material
> alteration in the nature or time of payment of the
> obligations.

------

[2]  Petitioners maintain that

>      This is a situation in which the application of
> Florida Statute §620.735(2) and (3) are necessary to
> allow some fairness to Petitioners who seek to offset
> income from the relief of liabilities with losses
> incurred in Tax Year 1993.

While the fact that petitioners incurred losses in 1993 explains
why they are taking the position that they must recognize the
gain in question for that year, that fact is irrelevant to our
resolving the issue presented.  See Fla. Stat. Ann. sec. 620.735
(West 1992).

We turn initially to petitioners' position under section 620.735(3) because they address that position first on brief. There are three requirements prescribed by that provision in order to come within its terms: (1) A person must agree to assume the existing obligations of a dissolved partnership; (2) the creditor of that partnership must know of the agreement by a person to assume the existing obligations of a dissolved partnership; and (3) such creditor must consent to a material alteration in the nature or time of payment of those obligations.

With respect to the first requirement, petitioners contend that in 1992 Mr. Palermo agreed to assume Mr. McDaniel's "share of the partnership obligations." In support of that contention, petitioners rely on Mr. McDaniel's testimony. Mr. McDaniel testified (1) on the one hand, that he could not remember the discussion that he had had with Mr. Palermo regarding the partnership's liabilities and (2) on the other hand, that Mr. Palermo "was to assume * * * my share of the partnership obligations." We found Mr. McDaniel's testimony regarding Mr. Palermo's alleged assumption of Mr. McDaniel's share of the liabilities of Second Street to be inconsistent and not helpful. We also found Mr. Palermo's testimony on this matter to be inconsistent and not helpful. Mr. Palermo testified that he believed that what he and Mr. McDaniel agreed to in 1992 was that Mr. Palermo was to assume Mr. McDaniel's interest in Second Street and the responsibilities

of the partnership, which Mr. Palermo defined as "The management of the partnership; the financial obligations; the management of the partnership; basically taking over his partnership interest." Mr. Palermo admitted during his testimony that there was never any written release, and he did not recall any oral release, of Mr. McDaniel from the obligations of Second Street. Consistently, Mr. Palermo gave the following testimony about the Second Street loan:

> I don't think that ever came up as a specific topic. Our relationship was very informal. And I looked at this as an opportunity to obtain a larger interest in the partnership, which would allow me to manage it better.

Inconsistently, Mr. Palermo further testified that he did not expect Mr. McDaniel to pay any obligations concerning the partnership.

We are not persuaded from the testimony of Mr. McDaniel and Mr. Palermo (1) that during 1992 Mr. Palermo agreed, either orally or in writing, to assume Mr. McDaniel's liability as a guarantor of the Second Street loan and (2) that either Mr. McDaniel or Mr. Palermo believed that Mr. McDaniel was in fact discharged from that liability. In this regard, it is significant that other general partners of Second Street who terminated their respective interests in that partnership during the mid-to-late 1980's received express releases by the partnership's creditors from any liability for the obligations of the part-

nership. In addition, as respondent points out, Mr. McDaniel has been specializing in real estate law since 1969 and must have known that, in order to be relieved of his share of the partnership's liabilities, he had to obtain from the Bank a formal release of his liability as a guarantor of the Second Street loan. The most favorable interpretation of the testimony of Mr. McDaniel and Mr. Palermo would be that they merely assumed that if Mr. Palermo were to receive Mr. McDaniel's share of the partnership assets, Mr. Palermo should pay the partnership obligations. Such an assumption does not satisfy the requirement of section 620.735(3) that "a person agrees to assume the existing obligations of a dissolved partnership". On the instant record, we find that petitioners have failed to meet their burden of showing that Mr. Palermo agreed to assume Mr. McDaniel's share of the obligations of Second Street. We further find on that record that petitioners have failed to establish that the first requirement of section 620.735(3) (i.e., that "a person agrees to assume the existing obligations of a dissolved partnership") is satisfied.

Assuming arguendo that we had found that Mr. Palermo agreed to assume Mr. McDaniel's share of the obligations of Second Street, petitioners also must show under section 620.735(3) that NationsBank/Amresco knew of that agreement in 1993. Petitioners admit that "There was no testimony that NationsBank was told that

Palermo was assuming the existing obligations of the partner-ship." However, petitioners assert that "the bank knew Palermo was shouldering the obligation to pay the partnership obligations after McDaniels [sic] removed himself from the partnership." In support of their position, petitioners point, inter alia, to several of the written internal reports, including those dated June 1992, December 1992, June 1993, and July 1993. Respondent contends that there is "no evidence that the bank was aware on [sic] any discharge of petitioners' liability in 1993."

We agree with respondent. Although petitioners are correct that the Bank knew in 1993 that Mr. Palermo was "shouldering the obligation to pay" the 1989 note, that fact does not establish knowledge on the part of NationsBank/Amresco that Mr. Palermo assumed Mr. McDaniel's partnership obligations. Nor do the written internal reports show that the Bank was aware of any agreement by Mr. Palermo to assume Mr. McDaniel's partnership obligations. To the contrary, those reports, and the testimony of Mr. Martens, who was responsible for the management of the Second Street loan during most of 1993 and during 1994 until it was paid off in October 1994, establish that NationsBank/Amresco did not release Mr. McDaniel from his guaranty of that loan. In addition, when questioned about whether the Bank officials were aware of his agreement with Mr. McDaniel, Mr. Palermo testified: "I believe that, through the process of the Parker bankruptcy and

our negotiations, they were aware that I was the chief partner and I had purchased Mr. McDaniel's interest."  Such testimony does not establish that NationsBank/Amresco was aware of any assumption by Mr. Palermo of Mr. McDaniel's partnership obligations.

On the present record, we find that petitioners have failed to meet their burden of showing that NationsBank/Amresco knew of any assumption by Mr. Palermo of Mr. McDaniel's partnership obligations.  We further find on that record that petitioners have failed to satisfy their burden of showing that they comply with the requirement of section 620.735 that a creditor of a partnership which is dissolved know of any agreement by a person to assume that partnership's existing obligations.

Petitioners have also failed to persuade us on the instant record that the third and last requirement under section 620.735(3) is satisfied.  That is because they have failed to show that NationsBank/Amresco consented during 1993 to a material alteration in the nature or time of payment of the 1989 note.  On the record before us, we reject petitioners' contention that NationsBank "made a material alteration in the time of payment of the partnership loan by not insisting on a lump sum payment of principal on April 12, 1993 but allowing the payment of interest only".  The express terms of the 1989 note, the Second Street mortgage relating thereto, and Mr. McDaniel's guaranty, the first

two of which were signed by Mr. McDaniel as a general partner of Second Street and the last of which was signed by him individually, permitted the Bank to extend the time of payment under that note. The express terms of Mr. McDaniel's guaranty provide that his obligations as a guarantor of the 1989 note are to be unaffected by, inter alia, the Bank's extension of the time of payment of that note.

Moreover, under Florida law, the extension of the time for payment of a loan is not a material alteration of the terms of the loan. In Anderson v. Trade Winds Enters. Corp., 241 So. 2d 174, 178 (Fla. Dist. Ct. App. 1970), the District Court of Appeal for the Fourth District of Florida stated:

> The individual appellees' answers plead that their liability as guarantors was discharged by extensions of time for payment which the holder of the note accorded the maker. The evidence indicates that the note went into default when the first installment was due. Thereafter, instead of bringing immediate suit on the note, partial payments were accepted. The evidence does not indicate, however, that the holder and maker of the note legally modified the latter's obligation under the note. The extensions of time were gratuitous indulgences to avoid litigation. Such extensions, therefore, did not affect the guarantors' rights against the maker of the note and, therefore, did not discharge their liability as guarantors. * * *

In the instant case, the decision by NationsBank/Amresco not to notify Second Street in writing that the 1989 note was in default until about a year after Second Street failed to make the balloon payment that was due on April 12, 1993, did not constitute a

material alteration of the obligations under that note.[3]  Nor did that decision have any effect on the obligations of Mr. McDaniel as a guarantor of the 1989 note.

On the instant record, we find (1) that there was no material alteration in the nature or the time of payment of the 1989 note and (2) that the Bank did not consent to any such alteration.[4]  We further find on that record that petitioners have failed to establish that Mr. McDaniel was discharged in 1993 from his guaranty of the Second Street loan under section 620.735(3).

We turn next to petitioners' position that Mr. McDaniel was discharged in 1993 from his guaranty under section 620.735(2).  Under that provision, petitioners must show that Mr. McDaniel was discharged from his guaranty to the Bank by an agreement to that effect among himself, the Bank, and Mr. Palermo.  We have found that petitioners have not met their burden of establishing that Mr. Palermo agreed to assume Mr. McDaniel's share of the part-

---

[3]  The Bank made that decision because of the pending bankruptcy proceeding of Mr. Parker, a general partner of Second Street and another guarantor of the Second Street loan, and the desire of NationsBank/Amresco to give Mr. Palermo, a valued customer, the opportunity to come into compliance with the loan terms as soon as Mr. Parker's bankruptcy proceeding was resolved.

[4]  Even if the terms of the loan had been altered, as noted above, under the terms of his guaranty Mr. McDaniel's obligation as a guarantor of the Second Street loan would not have been affected by any such alteration.

nership obligations.  Petitioners contend, however, that an agreement in 1993 among Mr. McDaniel, the Bank, and Mr. Palermo to release Mr. McDaniel from his guaranty "can be inferred from the course of dealing between the bank and Palermo having knowledge that McDaniels [sic] was no longer a partner."  Petitioners point to, inter alia, the following in an effort to support that contention:  The Bank did not notify Mr. McDaniel that the partnership had not timely made the balloon payment that was due on April 12, 1993, under the 1989 note; the Bank did not notify Mr. McDaniel or Second Street that the 1989 note was in default during 1993; the Bank materially changed the terms of the 1989 note and relinquished its right to receive the balloon payment; the topic of Mr. McDaniel's liability with respect to the 1989 note did not arise in discussions during 1993 between Mr. Palermo and personnel of the Bank; and the written internal reports of the Bank that were prepared during 1993 show that the Bank understood that Mr. McDaniel was discharged from his liability as a guarantor of the Second Street loan.

On the record before us, we reject petitioners' position that an agreement in 1993 among Mr. McDaniel, the Bank, and Mr. Palermo to release Mr. McDaniel from his liability as a guarantor of the 1989 note may be inferred within the meaning of section 620.735(2) from the course of dealing during that year between Mr. Palermo and the Bank.  The foregoing points on which pe-

titioners rely are not established by the record and/or are irrelevant to a determination of whether such an agreement may be so inferred.

We note initially that the Bank had no duty to notify Mr. McDaniel as a guarantor of the 1989 note that the partnership had not timely made the balloon payment under that note. Nor was the Bank required to notify Mr. McDaniel as a guarantor of any default under the 1989 note.[5] Furthermore, contrary to petitioners' contention, the Bank exercised its right under the 1989 note to delay collection of the balloon payment and did not materially change the terms of, or forgo its right to receive the balloon payment under, that note. Indeed, after the Bank notified Second Street in April 1994 that the Second Street loan was in default, the partnership obtained financing from Northern Trust, which it used in October 1994 to pay off that loan. In addition, Mr. Palermo's testimony that the topic of Mr. McDaniel's liability did not arise in his discussions during 1993 with personnel of

---

[5] It is noteworthy that Mr. Palermo did inform Mr. McDaniel that the balloon payment had not been timely made, at least some time shortly before Mr. McDaniel wrote Mr. Martens on Apr. 26, 1994, with respect to the Apr. 21, 1994 letter that Mr. Martens had sent to Mr. Palermo informing him that NationsBank/Amresco considered the 1989 note to be in default. Since Mr. McDaniel continued to see Mr. Palermo on a daily basis throughout the years at issue after he assigned his partnership interest to Mr. Palermo in May 1992, we believe that it is likely that Mr. McDaniel was aware well before April 1994 that Second Street had not made the balloon payment.

NationsBank/Amresco does not establish, as petitioners assert, that there was a clear inconsistency between Mr. McDaniel's guaranty and later conduct by NationsBank/Amresco. Moreover, petitioners concede that, unlike the other partners who withdrew from Second Street during the mid-to-late 1980's and each of whom received from the creditor bank of Second Street an express release from his/her liability for the partnership obligations to such bank, Mr. McDaniel did not obtain an express release by NationsBank/Amresco from his guaranty of the Second Street loan. Finally, contrary to petitioners' contention, the written internal reports of the Bank that were prepared during 1993 and 1994 were consistent with the written internal reports prepared during 1992. Those reports show that throughout 1993 Nations-Bank/Amresco considered Mr. McDaniel to be a guarantor of the 1989 note. Indeed, as late as June 30, 1994, the Bank was evaluating the assets of, inter alia, Mr. McDaniel as a guarantor of the Second Street loan, and Mr. Martens testified that the Bank affirmatively decided not to discharge him from that guaranty.

Significantly, the U.S. Court of Appeals for the Eleventh Circuit, to which an appeal in this case normally would lie, has considered whether, pursuant to section 620.735(2), a guarantor of a loan was discharged from his guaranty. See Weiss v. Commissioner, 956 F.2d 242 (11th Cir. 1992), vacating and remanding

T.C. Memo. 1990-492. In Weiss, the taxpayer Robert B. Weiss (Mr. Weiss) entered into a partnership agreement in November 1978 with three other individuals (Hillman group partners) for the purpose of purchasing and operating a motel. See id. at 243. In February 1979, in connection with the financing of that partnership (Hillman group/Weiss partnership), Mr. Weiss personally guaranteed the participation of Flagship Bank of Tampa (Flagship) in $300,000 of a $1,000,000 loan to the partnership from another bank. See id. On October 5, 1979, because the Hillman group/Weiss partnership needed an infusion of capital, one of the Hillman group partners requested Mr. Weiss and the other partners to contribute additional capital to the partnership (capital call). All of the Hillman group partners satisfied their share of that capital call, but Mr. Weiss did not. See id. As a result, on November 19, 1979, one of the Hillman group partners notified Mr. Weiss that the Hillman group/Weiss partnership had acquired his partnership interest on November 15, 1979, pursuant to a provision in the Hillman group/Weiss partnership agreement that permitted such an acquisition if a partner failed to satisfy a capital call within 30 days. The Commissioner of Internal Revenue had determined, inter alia, that, because Mr. Weiss was relieved of his partnership liability on or before November 15, 1979, he realized a short-term capital gain on his share of the Hillman group/Weiss partnership liabilities for which he was no

longer responsible. See id. at 243-244. After examining section

620.735(2), the Court of Appeals stated:

> No express or inferred agreement existed here. There
> was no express agreement between Weiss and the Hillman
> Group partners relieving Weiss of liability; Flagship
> did not expressly release Weiss from his personal
> guarantee; and nothing in the course of dealings be-
> tween the Hillman Group and Flagship permits the in-
> ference that Flagship released Weiss from his personal
> guarantee.
>
> Because the Tax Court did not indicate what course
> of dealings showed that Weiss was relieved of liabil-
> ity, we suppose that Flagship's extension of a $200,000
> line of credit to the Hillman Group somehow influenced
> the Tax Court. But this credit extension is in no way
> inconsistent with the fact that Flagship still consid-
> ered Weiss personally liable on his guarantee of the
> loan participation. Without a clear inconsistency
> between the written guarantee and later conduct by
> Flagship, we see no reason to infer that Weiss had been
> discharged from his obligation pursuant to the guaran-
> tee. For example, we might decide that Weiss was
> relieved from his liability by the course of dealings
> if, without expressly releasing Weiss, Flagship had
> substituted a new written guarantee from the Hillman
> Group or one of its members after Weiss' partnership
> interest was terminated. Or, for another example, we
> might also have decided that Weiss was released if, in
> the course of dealings, Flagship had been forced to
> recover on their loan participation and sought recovery
> only from the Hillman Group and not from Weiss. But
> here nothing in the record shows that Flagship had
> released Weiss from his personal guarantee. [Id. at
> 245.]

Petitioners attempt to distinguish Weiss. They contend that

"Weiss did not present a situation, such as the instant case,

where the loan became due and the payment was changed from a

balloon payment to payment of interest only." As discussed

above, we reject petitioners' position that the terms of the 1989

note were materially altered, "and the payment [under that note] was changed from a balloon payment to a payment of interest only." We conclude that petitioners have failed in their attempt to distinguish Weiss v. Commissioner, supra, from the present case.[6]

On the record before us, we find that petitioners have failed to carry their burden of showing that Mr. McDaniel was discharged in 1993 from his guaranty of the Second Street loan under section 620.735(2).

In contrast to the course of dealings between Mr. Palermo and NationsBank/Amresco during 1993, their course of dealings during 1994 supports respondent's position that Mr. McDaniel was released in 1994 from his guaranty of the Second Street loan. The Bank notified Mr. Palermo in the April 21, 1994 letter that the 1989 note was in default. Mr. McDaniel wrote to NationsBank on April 26, 1994, in order to request on behalf of Second Street that the Bank forbear from taking any action with respect to that default until June 15, 1994. Mr. Palermo was able to obtain

---

[6] Even if petitioners had established the distinction that they allege between the instant case and Weiss v. Commissioner, 956 F.2d 242 (11th Cir. 1992), vacating and remanding T.C. Memo. 1990-492, we would find any such distinction to be irrelevant to our determination of whether it could be inferred from the course of dealings during 1993 between Mr. Palermo and NationsBank/ Amresco that Mr. McDaniel was discharged in that year from his guaranty of the 1989 note.

alternative financing for Second Street from Northern Trust.  On October 18, 1994, Northern Trust acquired the 1989 note from NationsBank/Amresco for $595,252.65, which amount was the sum of (1) the outstanding principal balance of $590,850 and (2) the accrued, unpaid interest of $4,402.65, which were due under that note.  On the same date, a replacement note payable to Northern Trust in the amount of $590,850 was executed on behalf of Second Street by Mr. Palermo as a general partner and by Mr. Palermo as president of George Palermo Architects, Inc., the other general partner of Second Street.  The replacement note replaced the 1989 note of Second Street to the Bank.  The collateral for the replacement note was the Second Street real property, Mr. Palermo's unconditional guaranty, and Mr. Palermo's pledge of certificates of deposit in the amount of $230,000.  Northern Trust did not solicit or obtain from Mr. McDaniel any guaranty or other agreement by him to be liable, contingently or otherwise, with respect to the replacement note issued by Second Street to Northern Trust.

Based on our examination of the entire record in this case, we find that petitioners have failed to show that Mr. McDaniel was discharged in 1993 from his guaranty of the Second Street loan.  We further find on that record that petitioners have

failed to show that Mr. McDaniel was not discharged in 1994 from that guaranty.[7]

Section 6662(a) imposes an addition to tax equal to 20 percent of the underpayment of tax attributable to, inter alia, negligence or disregard of rules or regulations under section 6662(b)(1). For purposes of section 6662(a), the term "negligence" includes any failure to make a reasonable attempt to comply with the Code, and "disregard" includes any careless, reckless, or intentional disregard. See sec. 6662(c). Negligence has also been defined as a lack of due care or a failure to do what a reasonable person would do under the circumstances. See Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179; Antonides v. Commissioner, 91 T.C. 686, 699 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Neely v. Commissioner, 85 T.C. 934, 947 (1985).

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, such portion. See sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith depends upon the pertinent facts and circum-

---

[7] We have considered all of the contentions of petitioners that are not discussed herein, and we find them to be without merit and/or irrelevant.

stances, including the taxpayer's efforts to assess his or her proper tax liability and the knowledge and experience of the taxpayer. See sec. 1.6664-4(b)(1), Income Tax Regs.

As we understand petitioners' position, they contend that they are not liable for 1994 for the accuracy-related penalty under section 6662(a) with respect to petitioners' underpayment of tax for that year that is attributable to their failure to report in their 1994 return long-term capital gain of $48,192 and their erroneously claiming in that return a dependency exemption for their daughter Holly McDaniel.[8] Petitioners make no argument with respect to that position in their opening brief. In their reply brief, they assert:

> The Respondent has taken the position that all the adjustments made by the agent are the result of negligence of the Petitioners. Specific acts of negligence have not been shown. Negligence penalties should not be assessed against the Petitioners.

Petitioners, not respondent, have the burden of proving that respondent's determinations in the notice, including the determinations under section 6662, are erroneous. See Rule 142(a). On the record before us, we find that petitioners have failed to satisfy that burden. Accordingly, we sustain respondent's determinations under section 6662(a) for 1994 with respect to

---

[8] Petitioners concede respondent's determinations under sec. 6662 with respect to the other items that result in petitioners' underpayment for each of the years at issue.

petitioners' underpayment of tax for that year that is attributable to their failure to report in their 1994 return long-term capital gain of $48,193 and their erroneously claiming in that return a dependency exemption for their daughter Holly McDaniel.

To reflect the foregoing and the concessions of petitioners,

<u>Decision will be entered for respondent</u>.